# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>MARK JON DECLEMENTS, JR.,<br><br>Appellant. | No. 60263-6-II<br><br><br><br>UNPUBLISHED OPINION |

GLASGOW, J.—Mark Jon DeClements Jr. and an accomplice stole a Ford truck from an apartment complex. In a second truck, which was also stolen, the accomplice towed the Ford truck out of the apartment complex using a tow strap, while DeClements sat in the driver's seat of the Ford truck. As the trucks were leaving the apartment complex, the Ford truck hit and dragged another vehicle but did not stop. Police soon found and arrested DeClements and the accomplice as they were pulling onto the highway. At the scene, police found a firearm in the truck that was towing the Ford truck. DeClements, who had a prior felony conviction, was not permitted to possess firearms.

Relevant here, a jury convicted DeClements of first degree unlawful possession of a firearm and hit and run of an unattended vehicle. DeClements appeals, arguing that the State needed to demonstrate that the firearm was operable when it was discovered. DeClements also contends that there was not sufficient evidence that he had actual physical control over the Ford truck, which the parties agree is the appropriate standard for hit and run.

This court has held that for an unlawful possession of a firearm charge, the State need only show that a firearm is a "gun in fact" and not that it was operable when it was found. Here, there was sufficient testimony from officers who viewed the firearm at the scene that it was a gun in fact.

Regarding DeClements' hit and run conviction, Washington case law demonstrates that a defendant need not have complete control over all the driving mechanisms of a vehicle to be the operator of the vehicle or have actual physical control of the vehicle. And here, there was testimony from an officer that DeClements would have had some control over the steering and brakes of the Ford truck while it was being towed with a tow strap. Additionally, the jury was instructed on accomplice liability for the hit and run charge, and there was sufficient evidence that DeClements was aiding the driver of the towing truck to steal the Ford truck when the Ford truck hit an unattended vehicle while steering out of the apartment complex. Accordingly, we affirm.

FACTS

I. BACKGROUND

A witness saw a black truck circling her apartment complex several times at about 12:30 a.m. on October 1, 2021. She saw someone exit the black truck from the passenger side. She then saw her neighbor's Ford truck roll into the center of the parking lot. At this point, the witness called the police.

The passenger who had exited the black truck then got back into the passenger side of the black truck and the truck did another loop of the apartment complex. After this final loop, the black truck stopped in front of the Ford truck, and the passenger got out again. The passenger attached a "tow strap" to the back of the black truck and the front of the Ford truck before getting into the

driver's seat of the Ford truck. 1 Verbatim Rep. of Proc. (VRP) (July 24, 2024) at 363. The tow strap was about a car length long.

As the trucks left the apartment complex with the black truck towing the Ford truck, the Ford truck hit another neighbor's car, dragging the car out of its parking spot. After hitting the neighbor's car, the trucks exited the apartment complex area.

The police found the two trucks pulling onto the highway with the black truck towing the Ford truck. The police pulled over the trucks. Once the trucks came to a stop, DeClements, who was in the driver's seat of the Ford truck, exited the Ford truck and walked to the passenger side of the black truck.

Police spoke with DeClements and the driver of the black truck, Jeffrey Harry. Police determined that both of the trucks were stolen and arrested DeClements and Harry. Police saw that the Ford truck's ignition was "punched," and the bezel where a driver would typically insert a key was missing. 2 VRP (July 24, 2024) at 472.

Police also found a firearm on the floor near the front seat of the black truck. DeClements had a prior felony conviction, so he was not permitted to possess a firearm.

The State charged DeClements with hit and run of an unattended vehicle and first degree unlawful possession of a firearm, among several other crimes.[1]

---

[1] Based on documents and evidence found at the scene, the State also charged DeClements with theft of a motor vehicle, possession of a stolen vehicle, second degree identity theft, forgery, unlawful possession of payment instruments, and two counts of third degree possession of stolen property. There are no issues related to those charges on appeal.

## II. TRIAL

### A. Relevant Testimony and Motions

#### 1. Testimony about the firearm

During trial, one police officer testified that the firearm found in the black truck was a 9 millimeter "Smith & Wesson M&P Shield." 1 VRP (July 23, 2024) at 276. The firearm was loaded with a single round in the chamber. The firearm also had a magazine attached, which contained additional ammunition. The firearm had a serial number on it and was listed as stolen. Though police did not know if anybody had attempted to fire the firearm, when asked if the firearm was a "true firearm," the officer said, "Yes, it was." 1 VRP (July 23, 2024) at 277-78. The officer further confirmed that it was not "a mock gun, not a BB gun that shoots pellets or anything; this is an actual firearm." 1 VRP (July 23, 2024) at 278. Another police officer testified that based on looking at the firearm at the scene, it was "a true firearm . . . an actual firearm that shoots bullets." 2 VRP (July 24, 2024) at 443-44.

#### 2. Testimony about towing

The witness who initially saw the black truck at the apartment complex stated that, though she was not a "car person," she assumed the Ford truck started rolling in the parking lot because someone "cut the brake lines or something." 1 VRP (July 24, 2024) at 377. The witness's fiancé, who also saw the events, testified that she assumed the Ford's brake line was cut because the vehicle started rolling without having been started.

The witness's fiancé additionally testified that while the black truck towed the Ford truck out of the apartment complex area, it seemed like the Ford truck "didn't have any power steering because when they tried to turn, as it's a pretty tight parking lot, that is when they hit our other

4

neighbor's car across the way." 2 VRP (July 24, 2024) at 403. She further explained that after the Ford truck hit the neighbor's car, "I saw that there was a little bit of a struggle, and it was obvious that whoever was doing this was panicking; and so they began to increase speed in the black truck, and that is when the neighbor's car kind of got shifted, because it had already collided, they were trying to continue out of the apartment." 2 VRP (July 24, 2024) at 405.

On cross-examination of an officer, defense counsel explored who had control over the Ford truck:

> [Defense Counsel:] And would it be fair to say that the driver that really had to pull over was the driver of the [black] truck, since that was the driver that was in control of both vehicles?
> [Officer:] Yes, but I would also -- I would disagree slightly on who's in control over the [Ford truck].
> [Defense Counsel]:] Well, would the [Ford truck] be able to pull over if the black [truck] didn't pull over?
> [Officer:] No. They would have to pull over simultaneously together, referring to braking, some steering involved, which would be needed in the [Ford truck], the [Ford truck] being towed.

2 VRP (July 25, 2024) at 535.

### 3. Motion to dismiss unlawful possession of a firearm

At the close of the State's case-in-chief, defense counsel made a motion to dismiss the unlawful possession of a firearm charge. Defense counsel argued that the State did not prove "that the firearm that was discovered was operational, that it had been test fired to see that it did work, or that there weren't any issues that would render it incapable of firing a bullet." 2 VRP (July 25, 2024) at 571.

The trial court denied the motion because there was evidence from at least two witnesses indicating that the firearm "was a firearm and appeared to be capable of firing a bullet." 2 VRP

(July 25, 2024) at 572. The trial court determined that this was enough to meet the State's burden under the applicable statute.

B.      Jury Instructions and Verdict

Relevant here, the trial court instructed the jury that "[a] person commits the crime of unlawful possession of a firearm in the first degree when [they have] previously been convicted of a serious offense and knowingly [have] in [their] possession or control any firearm." Clerk's Papers (CP) at 174. The trial court explained that "[a] firearm is a weapon or device from which a projectile may be fired by an explosive such as gunpowder." CP at 177.

The trial court also instructed the jury that to convict DeClements for hit and run, it must find

> (1) That on or about October 1, 2021, the defendant or an accomplice was the driver of a vehicle;
> (2) That the defendant's vehicle collided with another vehicle that was unattended;
> (3) That the defendant or an accomplice knew that he had been involved in an accident;
> (4) That the defendant or an accomplice failed to stop immediately and either then and there locate the operator or owner of the vehicle struck and give that person his name and address and the name and address of the owner of the vehicle he was operating or leave in a conspicuous place in the vehicle struck a written notice giving his name and address and the name and address of the owner of the vehicle he was operating.

CP at 160.

Per the jury instructions, a person is an accomplice to a crime "if, with knowledge that it will promote or facilitate the commission of the crime, he or she either: (1) solicits, commands, encourages, or requests another person to commit the crime; or (2) aids or agrees to aid another person in planning or committing the crime." CP at 149. The instructions further stated that a person "who is present at the scene and ready to assist by his or her presence is aiding in the

6

commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice." *Id.*

The jury convicted DeClements of first degree unlawful possession of a firearm and hit and run of an unattended vehicle, as well as most of the other charged crimes.[2] The trial court sentenced DeClements to 77 months with 12 months community custody.

## ANALYSIS

### I. SUFFICIENCY OF THE EVIDENCE STANDARD

"The State bears the burden of proving all the elements of an offense beyond a reasonable doubt." *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). When reviewing a claim of insufficient evidence, this court asks whether, viewing all the evidence in the light most favorable to the State, a rational trier of fact could find that all of the crime's essential elements were proven beyond a reasonable doubt. *State v. Cardenas-Flores*, 189 Wn.2d 243, 265, 401 P.3d 19 (2017). Under this standard, the defendant admits the truth of the State's evidence and all reasonable inferences that arise from that evidence. *Id.* at 265-66.

Both circumstantial and direct evidence are considered equally reliable. *Id.* at 266. "However, inferences based on circumstantial evidence must be reasonable and cannot be based on speculation." *State v. Vasquez*, 178 Wn.2d 1, 16, 309 P.3d 318 (2013).

### II. UNLAWFUL POSSESSION OF A FIREARM

DeClements argues that the State failed to provide sufficient evidence that the firearm found was capable of firing a projectile by an explosive like gunpowder. DeClements contends

---

[2] The jury found DeClements not guilty of forgery.

that in order to convict for unlawful possession of a firearm, the State needed to prove beyond a reasonable doubt that the firearm was operable. We disagree.

A person is guilty of first degree unlawful possession of a firearm if they own, have in their possession, or have in their control any firearm after having previously been convicted of a serious offense. Former RCW 9.41.040(1)(a) (2020). Under former RCW 9.41.010(11) (2020),[3] a "firearm" is "a weapon or device from which a projectile or projectiles may be fired by an explosive such as gunpowder."

This court has repeatedly held that under the language in former RCW 9.41.010(11), a firearm "'need not be operable during the commission of a crime.'" *State v. Gouley*, 19 Wn. App. 2d 185, 195, 494 P.3d 458 (2021), *review denied* 198 Wn.2d 1041 (2022) (quoting *State v. Raleigh*, 157 Wn. App. 728, 734, 238 P.3d 1211 (2010)); *see also State v. Olsen*, 10 Wn. App. 2d 731, 737-38, 449 P.3d 1089 (2019), *review denied* 195 Wn.2d 1002 (2020). "Instead, the State must set forth evidence showing that the firearm is 'a gun in fact, not a toy gun; and the real gun need not be loaded or even capable of being fired to be a firearm.'" *Gouley*, 19 Wn. App. 2d at 195-96 (quoting *State v. Faust*, 93 Wn. App. 373, 380, 967 P.2d 1284 (1998)).

DeClements cites *State v. Recuenco*, 163 Wn.2d 428, 180 P.3d 1276 (2008), to support his contention that to convict for first degree unlawful possession of a firearm, the State must demonstrate that the firearm was operable at the time it is discovered. In *Recuenco*, the Washington Supreme Court evaluated whether a harmless error analysis applied when the State sought a firearm sentencing enhancement after only a deadly weapon sentencing enhancement had been

---

[3] This was the version of the statute that was in effect at the time of the commission of the crime on October 1, 2021.

charged and found by the jury. 163 Wn.2d at 431-32. In this context, the *Recuenco* court said that "a jury must be presented with sufficient evidence to find a firearm operable" to uphold a firearm sentencing enhancement. *Id.* at 437. However, both this court and Division Three have since determined that this language in *Recuenco* is nonbinding dicta. *Olsen*, 10 Wn. App. 2d at 737-38; *State v. Tasker*, 193 Wn. App. 575, 592, 373 P.3d 310, *review denied* 186 Wn.2d 1013 (2016).

Given this court's holdings, DeClements' argument fails. The State did not need to prove the firearm was operable. Additionally, under the correct standard, the State provided sufficient evidence that the firearm was a gun in fact. A police officer testified about the firearm's caliber and brand, noting that it was a 9 millimeter Smith & Wesson. The firearm was also loaded and had an attached magazine with ammunition. And the firearm had a serial number that matched a stolen firearm. Finally, two officers who had the opportunity to view the firearm at the scene testified at trial that the firearm was an "actual firearm." 1 VRP (July 23, 2024) at 278; 2 VRP (July 24, 2024) at 444.

Accordingly, there was ample evidence demonstrating that the firearm was a gun in fact and not a toy gun. As a result, viewing the evidence in the light most favorable to the State, there was sufficient evidence supporting DeClements' first degree unlawful possession of a firearm conviction, and the trial court did not abuse its discretion by denying DeClements' motion.

### III. HIT AND RUN

DeClements argues that the State failed to provide sufficient evidence to convict DeClements of hit and run of an unattended vehicle. Specifically, DeClements disputes whether the State demonstrated that he was the "driver" of the Ford truck, which the parties agree hinges

on whether he had actual physical control over the truck. We conclude there was sufficient evidence to support the conviction for hit and run of an unattended vehicle.

A.      Driver or Operator and Actual Physical Control

RCW 46.52.010(1), which defines the crime of hit and run of an unattended vehicle, states:

> The operator of any vehicle which collided with any other vehicle which is unattended shall immediately stop and shall then and there either locate and notify the operator or owner of such vehicle of the name and address of the operator and owner of the vehicle striking the unattended vehicle or shall leave in a conspicuous place in the vehicle struck a written notice, giving the name and address of the operator and of the owner of the vehicle striking such other vehicle.

For the purposes of Title 46 RCW, the statute defines "operator or driver" as "every person who drives or is in actual physical control of a vehicle." RCW 46.04.370; *see also* RCW 46.04.010. Washington courts have defined "actual physical control" as "'existing' or 'present bodily restraint, directing influence, domination or regulation.'" *In re Arambul*, 37 Wn. App. 805, 808, 683 P.2d 1123 (1984) (quoting *State v. Smelter*, 36 Wn. App. 439, 442, 674 P.2d 690 (1984)).

Here, the to-convict jury instruction for hit and run appears to use the terms "driver" and "operator" interchangeably:

> (1) That on or about October 1, 2021, the defendant or an accomplice was the *driver* of a vehicle;
> (2) That the defendant's vehicle collided with another vehicle that was unattended;
> (3) That the defendant or an accomplice knew that he had been involved in an accident;
> (4) That the defendant or an accomplice failed to stop immediately and either then and there locate the operator or owner of the vehicle struck and give that person his name and address and the name and address of the owner of the *vehicle he was operating* or leave in a conspicuous place in the vehicle struck a written notice giving his name and address and the name and address of the owner of *the vehicle he was operating*.

CP at 160 (emphasis added). Jury instructions that are not objected to become the law of the case for the purposes of appeal. *State v. Johnson*, 188 Wn.2d 742, 755, 399 P.3d 507 (2017). Additionally, the parties do not dispute that "actual physical control" is the applicable standard.

In *Hanks v. Landert*, a civil case, a person was in the driver's seat of a car being towed in icy conditions. 37 Wn.2d 293, 294, 223 P.2d 443 (1950). The car was connected to the towing vehicle by a 4-to-12-foot chain. *Id.* The person being towed left the engine off and put the car in neutral. *Id.* He and the driver of the towing car agreed that he would blow his horn if he wanted to stop. *Id.* One witness testified that, in contrast with a towed car that is hoisted on a wrecker giving the towing driver complete control, when a car is towed on a chain, the towing vehicle is "'at the mercy'" of the person in the towed vehicle. *Id.* at 296 (quoting record). Another witness saw the towed car, but not the towing car, weaving back and forth on the road. *Id.* The Washington Supreme Court determined that based on this evidence, a jury could have found that the person being towed exercised "a certain amount of control over the operation" of the towed vehicle, and that "the accident would not have occurred except for his negligent conduct." *Id.* at 300.

Since *Hanks*, in both civil and criminal cases, Washington courts have acknowledged that control over only one mechanism of driving a car can constitute sufficient control to be held liable for negligence or guilty of crimes requiring driving or physical control over a vehicle.

For example, in *Arambul*, a passenger in a moving car caused an accident when she grabbed the steering wheel and caused the car to swerve into oncoming traffic and fatally collide with another vehicle. 37 Wn. App. at 806-07. Division Three concluded that the passenger was the operator of the vehicle because, even though she did not have control of the gas, brake, or gearshift, she had actual physical control over the vehicle in the moments before the crash when she grabbed

the steering wheel: "for that instant in time she directed the path of the automobile and caused the death of another." *Id.* at 808.

In *North Pacific Insurance Co. v. Christensen*, the Washington Supreme Court assessed the meaning of "operator" under an underinsured motorist insurance policy. 143 Wn.2d 43, 48, 17 P.3d 596 (2001). The court noted that, relying on dictionary definitions of "operator" and "driver," there is "no suggestion that an 'operator' must be a single person who is in command of all the controls of a car." *Id.* at 49. Thus, under similar facts as *Arambul*, the *Christensen* court concluded that a passenger who suddenly grabbed the steering wheel became an operator of the vehicle. *Id.* at 50.

In *Smelter*, police found the defendant, who had a blood alcohol level higher than the legal limits for driving, in the driver's seat of a car, pulled over on the side of the road. 36 Wn. App. at 440. The car was out of gas. *Id.* Division One held that the defendant had actual physical control over the car because circumstantial evidence permitted "a legitimate inference that the car was where it was and was performing as it was because of the defendant's choice." *Id.* at 445. Though the court in *Smelter* was addressing "actual physical control" and not specifically driving or operating, the reasoning is still persuasive, especially because the parties here treat actual physical control as the applicable standard.

B.      DeClements' and His Accomplice's Control

In this case, though witnesses to the crash testified that they assumed the Ford truck had its brake line cut and lacked power steering while it was being towed, a police officer also testified that DeClements had some control over the Ford truck's movements: "[The two trucks] would have to pull over simultaneously together, referring to braking, some steering involved, which

would be needed in the [Ford truck] . . . being towed." 2 VRP (July 25, 2024) at 535. Moreover, at least one Washington court has recognized that a person in the driver's seat of a towed car on a chain, which is similar to a tow strap, had some control over the operation of the towed vehicle and could be partially responsible for accidents involving the towed vehicle. *See Hanks*, 37 Wn.2d at 300.

And viewing this evidence in the light most favorable to the State, DeClements had more actual physical control over the Ford truck than the defendant in *Arambul*. At least some testimony showed that DeClements was in the driver's seat and had some control over steering, in addition to some control over the brakes. According to the officer's testimony, essentially the only mechanism that DeClements had no control over in the Ford truck was the acceleration. This is more control than the passenger in *Arambul* exercised when she momentarily grabbed the steering wheel. 37 Wn. App. at 806. And the facts here, viewed in the light most favorable to the State, allow an even stronger inference of actual physical control than in *Smelter*, where the car was stopped and out of gas. 36 Wn. App. at 440.

Accordingly, there was sufficient evidence here that DeClements exerted control over the Ford truck during the crash such that a rational juror could have convicted him for hit and run.

Additionally, although the State does not respond to DeClements' argument relating to accomplice liability, the jury received a to-convict instruction stating that it needed to find DeClements "*or an accomplice* was the driver of a vehicle" that hit an unattended vehicle without leaving the proper identifying information. CP at 160 (emphasis added). The jury also received an accomplice liability instruction stating that a person is an accomplice to a crime if they solicit, command, encourage, or request another person to commit the crime, or if they aid or agree to aid

another person in planning or committing the crime. The jury was entitled to rely on these instructions when determining DeClements' guilt. Considering the evidence in the light most favorable to the State, there was sufficient evidence that both DeClements and the driver of the towing car were working together to steal the Ford truck and to steer, or attempt to steer, the Ford truck out of the parking lot, and that DeClements did not insist on stopping to fulfill the statutory obligations to avoid the crime of hit and run.

As a result, either as a principal or as an accomplice, there was sufficient evidence to support DeClements' conviction for hit and run of an unattended vehicle.

CONCLUSION

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

GLASGOW, J.

We concur:

VELJACIC, C.J.

LEE, J.